UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WaterLegacy,

        Plaintiff,

v.

USDA Forest Service; Vicki Christiansen, in
her official capacity as Chief of the USDA
Forest Service; Constance Cummins, in her
official capacity as Forest Supervisor of the
Superior National Forest; and Poly Met
Mining, Inc.,

        Defendants.

Case No. 17-cv-276 (JNE/LIB)
ORDER

Minnesota Center for Environmental
Advocacy, Center for Biological Diversity,
and the W.J. McCabe Chapter of the Izaak
Walton League of America,

        Plaintiffs,

v.

Vicki Christiansen, in her official capacity
as Chief of the U.S. Forest Service; U.S.
Forest Service; Sonny Perdue, in his official
capacity as Secretary of Agriculture;
Constance Cummins, in her official capacity
as Supervisor of the Superior National
Forest; and Poly Met Mining, Inc.,

        Defendants.

Case No. 17-cv-905 (JNE/LIB)
ORDER

1

Save Our Sky Blue Waters, Save Lake
Superior Association, and Sierra Club,

        Plaintiffs,

v.

United States; United States Forest Service;
Vicki Christiansen, Chief of the U.S. Forest
Service, in her official capacity; PolyMet
Mining Corporation; and PolyMet Mining,
Inc.,

        Defendants.

Case No. 17-cv-909 (JNE/LIB)
ORDER

Center for Biological Diversity, Earthworks,
and Save Our Sky Blue Waters,

        Plaintiffs,

v.

David Bernhardt, in his official capacity as
Secretary of the U.S. Department of the
Interior; U.S. Fish and Wildlife Service;
Vicki Christiansen, in her official capacity
as Chief of the U.S. Forest Service; U.S.
Forest Service; and Poly Met Mining, Inc.,

        Defendants.

Case No. 17-cv-914 (JNE/LIB)
ORDER

---

Paula G. Maccabee, Just Change Law Office, appeared for the plaintiff in Case No. 17-cv-276.

Evan Mulholland, Minnesota Center for Environmental Advocacy, appeared for the plaintiffs in Case No. 17-cv-905.

Marianne Dugan appeared for the plaintiffs in Case No. 17-cv-909.

Marc D. Fink, Center for Biological Diversity, appeared for the plaintiffs in Case No. 17-cv-914.

David Fuller, United States Attorney's Office, District of Minnesota, appeared for the federal defendants in Case No. 17-cv-276, Case No. 17-cv-905, Case No. 17-cv-909, and Case No. 17-cv-914.

Andrew Tweeten, United States Attorney's Office, District of Minnesota, appeared for the federal defendants in Case No. 17-cv-276, Case No. 17-cv-905, Case No. 17-cv-909, and Case No. 17-cv-914.

Shaun Pettigrew, United States Department of Justice, appeared for the federal defendants in Case No. 17-cv-909.

Alison Finnegan, United States Department of Justice, appeared for the federal defendants in Case No. 17-cv-914.

Jay C. Johnson, Venable LLP, appeared for Poly Met Mining, Inc., in Case No. 17-cv-276, Case No. 17-cv-905, Case No. 17-cv-909, and Case No. 17-cv-914.

Monte A. Mills, Greene Espel PLLP, appeared for Poly Met Mining, Inc., in Case No. 17-cv-276, Case No. 17-cv-905, Case No. 17-cv-909, and Case No. 17-cv-914.

---

Poly Met Mining, Inc., controls the mineral rights on land located in the Superior National Forest through long-term leases. When these actions were commenced, the United States owned the surface rights to the land. Poly Met Mining seeks to build an open-pit mine on the land. The United States Forest Service refused to authorize surface mining on the land. To eliminate the conflict between Poly Met Mining's desire to build an open-pit mine and the Forest Service's management of the land, Poly Met Mining and the Forest Service proposed a land exchange, which is known as the NorthMet Project Land Exchange. In January 2017, the Forest Service issued a Final Record of Decision and approved the land exchange.

Asserting violations of the Federal Land Policy and Management Act, WaterLegacy brought an action, Case No. 17-cv-276, against the Forest Service, the Chief of the Forest Service, and the Forest Supervisor of the Superior National Forest in

January 2017. A few weeks later, WaterLegacy moved for a preliminary injunction. Poly Met Mining intervened as a defendant and moved to dismiss the action for lack of standing. Considering a litigation contingency in the agreement between the Forest Service and Poly Met Mining, a representation that the Forest Service would not allow ground-disturbing activity on the federal land before the transfer of titles, and the issues raised with respect to WaterLegacy's standing, the Court denied WaterLegacy's motion for a preliminary injunction.

In the meantime, three actions that relate to the NorthMet Project Land Exchange were commenced. In Case No. 17-cv-905, Minnesota Center for Environmental Advocacy, Center for Biological Diversity, and the W.J. McCabe Chapter of the Izaak Walton League of America brought an action against the Forest Service, the Chief of the Forest Service, the Forest Supervisor of the Superior National Forest, the Secretary of Agriculture, and Poly Met Mining for violations of the Federal Land Policy and Management Act. In Case No. 17-cv-909, Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club brought an action against the United States, the Forest Service, the Chief of the Forest Service, and Poly Met Mining for violations of the Weeks Act and the National Environmental Policy Act. And in Case No. 17-cv-914, Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters brought an action against the Secretary of the Interior, the United States Fish and Wildlife Service, the Chief of the Forest Service, and the Forest Service for violations of the Endangered Species Act. Asserting that the plaintiffs lacked standing and that their claims were not

ripe, Poly Met Mining moved to dismiss Case No. 17-cv-905, Case No. 17-cv-909, and Case No. 17-cv-914.

After the United States House of Representatives passed the Superior National Forest Land Exchange Act of 2017, H.R. 3115, 115th Congress, the Court stayed the four actions pending Congress's consideration of the Act and denied Poly Met Mining's motions to dismiss without prejudice to their renewal. While the cases were stayed, the land exchange closed. The United States Senate did not pass the Act. After the conclusion of the 115th Congress, the Court lifted the stays.

After the stays were lifted, Poly Met Mining renewed its motions to dismiss, and the plaintiffs in Case No. 17-cv-276, Case No. 17-cv-905, and Case No. 17-cv-909 moved for preliminary injunctions. The Court first considers the motions to dismiss. *See Laclede Gas Co. v. St. Charles Cty.*, 713 F.3d 413, 416-17 (8th Cir. 2013).

## I.  Motions to dismiss

Poly Met Mining moved to dismiss the four actions on the ground that the plaintiffs lack standing under Article III of the U.S. Constitution. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). "Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.' For a legal dispute to qualify as a genuine case or

controversy, at least one plaintiff must have standing to sue." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). "To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Id.* (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)); *see Iowa League of Cities*, 711 F.3d at 869. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

"Standing is determined as of the commencement of the lawsuit." *Disability Support All. v. Heartwood Enters., LLC*, 885 F.3d 543, 545 (8th Cir. 2018); *see Nolles v. State Comm. for Reorg. of Sch. Dists.*, 524 F.3d 892, 901 (8th Cir. 2008); *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000); *Park v. Forest Serv.*, 205 F.3d 1034, 1038 (8th Cir. 2000) ("It seems to us that if redressability may not be established by a development that occurs after the commencement of the litigation, neither may an injury-in-fact."). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife*, 504 U.S. at 561 (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *see Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). To decide a facial attack, "the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it

would defending against a motion brought under Rule 12(b)(6)." *Id.* (citation omitted). "In a factual attack, the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *Osborn*, 918 F.2d at 729 n.6); *see Heartwood Enters.*, 885 F.3d at 547; *cf. Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002) ("Because Faibisch's approach would constrain the power of a court hearing a 12(b)(1) motion, we reject her contention that factual challenges arise only when a court considers matters outside the pleadings."). Poly Met Mining's motions present factual attacks.

### A.    Case No. 17-cv-276

#### 1.    Complaint

WaterLegacy commenced this action on January 30, 2017. The following paragraphs summarize its complaint.

WaterLegacy "is a Minnesota non-profit organization founded to protect Minnesota's water resources, wetlands, wildlife, and habitats and the communities that rely on them, particularly from the threat of copper-nickel mining in sulfide-bearing ore in Northeastern Minnesota." Compl. ¶ 10. Many of its members live in northeastern Minnesota and use the Superior National Forest for recreational, educational, and scientific purposes. *Id.* One of its members "owns property in a Superior National Forest inholding a few miles cross-country from the federal land proposed to be exchanged, and watches wildlife and enjoys quietude that would be affected by the use of the federal lands for the proposed PolyMet mine." *Id.* Several of WaterLegacy's members "have

canoed, waded, viewed plants and wildlife, and conducted scientific testing in the Superior National Forest on or near the federal lands proposed for exchange." *Id.*

The Forest Service is an agency within the United States Department of Agriculture. *Id.* ¶ 12. The Forest Service is "charged with the responsibility of managing natural resources within the national forests throughout the United States." *Id.* Thomas Tidwell, the Chief of the Forest Service, is "the highest level official responsible for management actions carried out by the Forest Service - including the land exchange and process at issue herein."[1] *Id.* ¶ 13. Constance Cummins is the Forest Supervisor of the Superior National Forest. *Id.* ¶ 14. She was the deciding officer on the Final Record of Decision, which approved the NorthMet Project Land Exchange. *Id.*

The NorthMet Project Land Exchange "is a proposal to exchange 6,650 acres of contiguous federal land in the Superior National Forest . . . for 6,690 acres of private land in four tracts of land." *Id.* ¶ 15. The Forest Service issued the Final Record of Decision on January 9, 2017. *Id.*

The NorthMet Project Land Exchange "is proposed to allow [Poly Met Mining] to develop an open-pit copper-nickel mine in sulfur-bearing rock." *Id.* ¶ 19. Poly Met Mining "controls mineral rights to the ore body it proposes to mine on the federal lands through long-term mineral leases. The United States owns the remainder of the property rights on the federal lands, including rights to the surface lands that would be removed to

---

[1]     Vicki Christiansen was automatically substituted as a party. *See* Fed. R. Civ. P. 25(d).

enable [Poly Met Mining] to access minerals as well as 181 acres of mineral rights on that [sic] are not part of PolyMet's proposed open-pit mining proposed action." *Id.* ¶ 20.

"The federal lands are located adjacent to historic mining projects and are near other privately held land used for mining purposes." *Id.* ¶ 21. "The federal lands proposed for the [NorthMet Project Land Exchange] and privately owned lands in the same vicinity are zoned Mining and Minerals by the City of Babbitt." *Id.* ¶ 22.

The federal land proposed for the NorthMet Project Land Exchange was purchased by the Forest Service under the authority of the Weeks Act. *Id.* ¶ 25. "The Forest Service has taken the position that the mineral rights that were reserved when lands were conveyed to the United States do not include the right to surface mine as proposed by [Poly Met Mining]." *Id.* ¶ 26. "Due to the inconsistency between National Forest management objectives and [Poly Met Mining's] intended mining operations, in the absence of the [NorthMet Project Land Exchange] the Forest Service is not willing or able to authorize such private, surface mining operations on lands of the Superior National Forest." *Id.* ¶ 27. "The Forest Service's stated purpose and need for the [NorthMet Project Land Exchange] is to eliminate the conflict between [Poly Met Mining's] desire to surface mine and the Forest Service ownership and management of Superior National Forest lands and avoid the potential that [Poly Met Mining] would litigate in order to secure the right to surface mine on the federal lands." *Id.* ¶ 28. "No permits have been issued for the proposed [Poly Met Mining] open-pit copper-nickel

mine." *Id.* ¶ 30. Poly Met Mining will have to secure many state and federal permits to proceed with development of the proposed mine.[2] *Id.*

The Forest Service's approval of the NorthMet Project Land Exchange was based on an appraisal by Compass Land Consultants, Inc. *Id.* ¶ 31. Based on the appraisal, the Forest Service's Final Record of Decision states that the value of the federal land is $3,658,000 and that the value of the non-federal land is $4,083,000. *Id.* ¶ 34. As part of the land exchange, the Forest Service proposes to pay Poly Met Mining $425,000. *Id.*

The valuation of the federal land by Compass Land Consultants "was based only on the highest and best use for 'timber investment.'" *Id.* ¶ 36. "Sales comparisons were made with land only used for timber purposes." *Id.* ¶ 37. The properties used for sales comparisons are in Wisconsin or Michigan. *Id.* Under the sales comparison approach, Compass Land Consultants valued the federal land at $615/acre. *Id.* ¶ 38. Compass Land Consultants also used an income approach to value the federal land at $466/acre. *Id.* ¶ 39. Ultimately, Compass Land Consultants appraised the federal land at $550/acre. *Id.*

Compass Land Consultants identified nine sales of land in northeastern Minnesota to mining companies by private parties from 2008 to 2012. *Id.* ¶ 40. Prices ranged from $624/acre to $2556/acre. *Id.* "[N]one of these Northeastern Minnesota sales of land to mining companies by private parties and no other sales of land to mining companies by private parties were considered by the [Compass Land Consultants] appraisal in

---

[2]     Since this action's commencement, Poly Met Mining might have secured most, if not all, required permits.

determining the reasonable highest and best use of the federal property or the market value of the federal property, and none were considered by the Forest Service in approving the [NorthMet Project Land Exchange]." *Id.* ¶ 41.

WaterLegacy's Complaint contains three claims for relief. Each invokes the Administrative Procedures Act and the Federal Land Policy and Management Act. The first claim for relief asserts a failure to establish equal value of federal and non-federal lands. The second asserts an arbitrary, capricious, and unlawful failure to consider the highest and best use of the federal land for mining. The third asserts an arbitrary, capricious, and unlawful failure to use comparable sales in determining market value. WaterLegacy sought injunctive and declaratory relief.

### 2. Standing

Poly Met Mining moved to dismiss Case No. 17-cv-276 on the ground that WaterLegacy lacks standing under Article III of the U.S. Constitution. Poly Met Mining asserted that WaterLegacy's members are not injured by the land exchange because the federal land is inaccessible to the public. Any claim of injury based on the use of the federal land for the proposed mine, Poly Met Mining argued, lacked the imminence needed to establish WaterLegacy's standing. Finally, Poly Met Mining maintained that WaterLegacy cannot fairly trace any potential injury from the proposed mine to the Forest Service's land exchange decision.

WaterLegacy responded that the land exchange "would effectuate immediate on-the-ground changes in ownership, management and land use that would harm the interests of [its] members." It asserted that its members would be injured by loss of

access to the federal land, by the loss of the Forest Service's management of the federal land, by logging and construction activities, and by other activities permitted by zoning and private ownership resulting from the land exchange. WaterLegacy maintained that it "has standing based on the interests of its members who use and enjoy the subject federal lands and intend to do so in the future, which interests would be injured by the proposed PolyMet land exchange." WaterLegacy also argued that its "standing under Article III must … be sustained in light of the intended use of the property for an open-pit copper-nickel mine."

The Final Record of Decision does not authorize Poly Met Mining to build a mine. It states:

> A final decision on the land exchange will not authorize PolyMet's mining proposal to occur. Other governmental entities have the responsibility and authority to make decisions related to permitting the mining project, primarily the State of Minnesota and the U.S. Army Corps of Engineers …. The Forest Service assumes no responsibility for enforcing laws, regulations or policies under the jurisdiction of other governmental agencies.

The Final Record of Decision acknowledges "the myriad of final permitting and financial assurance specifications for mining activities on the land to be conveyed." When it commenced suit, WaterLegacy recognized "the many state and federal permits" that Poly Met Mining still had to secure to develop the mine. To the extent WaterLegacy asserted that it has standing based on "the intended use of the property for an open-pit copper-nickel mine," it presented neither "an injury that is concrete, particularized, and actual or imminent" nor an injury that is "fairly traceable to the defendant's challenged behavior."

*Dep't of Commerce*, 139 S. Ct. at 2565; *see Defenders of Wildlife*, 504 U.S. at 560-62.

Similarly, unless and until Poly Met Mining secures the permits needed to build its mine,

nothing in the record indicates it intends any changes to the federal land after the land

exchange that would affect those not on the property.  *See Summers v. Earth Island Inst.*,

555 U.S. 488, 494-96 (2009).  The Court turns to whether WaterLegacy has standing

based on the inability of its members to use the federal land after the land exchange.

The Supreme Court has held that "environmental plaintiffs adequately allege

injury in fact when they aver that they use the affected area and are persons 'for whom

the aesthetic and recreational values of the area will be lessened' by the challenged

activity."  *Laidlaw Envtl. Servs.*, 528 U.S. at 183; *see Sierra Club v. Kimbell*, 623 F.3d

549, 557 (8th Cir. 2010) (stating that "[s]tanding can be based on harms to recreational or

even aesthetic interests"); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172,

1176 (9th Cir. 2000) ("The recreational or aesthetic enjoyment of federal lands is a

legally protected interest whose impairment constitutes an actual, particularized harm

sufficient to create an injury in fact for purposes of standing.").  "Having a 'specific and

concrete plan … to enjoy the national forests' distinguishes a particular harm to a

recreational interest from mere generalized harm.  When the plaintiff is a group, this plan

must belong to an identified group member, not merely to the group at large."  *Ouachita

Watch League v. U.S. Forest Serv.*, 858 F.3d 539, 542-43 (8th Cir. 2017) (alteration in

original); *see Summers*, 555 U.S. at 494; *Ecological Rights Found. v. Pac. Lumber Co.*,

230 F.3d 1141, 1149 (9th Cir. 2000) ("[A] person who uses an area for recreational

purposes does not have to show that he or she lives particularly nearby to establish an

injury-in-fact due to possible or feared environmental degradation.  Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person.").

The Final Record of Decision states that "[t]he federal parcel is mostly surrounded by private land, lacks public overland access and experiences little if any current recreation, hunting or gathering use."  WaterLegacy relied on affidavits and declarations of two members, Rory Scoles and Robert Tammen, to establish its standing.

### a. Scoles

In an affidavit dated January 27, 2017, Scoles stated that he lives one mile outside of the Superior National Forest; that he hikes, camps, canoes, kayaks, snowshoes, cross-county skis, and guides back-country tours in the summer and winter; that he does these activities in the Superior National Forest near the federal land proposed for the exchange; that he "portaged [his] canoe about a mile and a half on the railroad and explored a creek to get up to where [he] could canoe the whole stretch of the Partridge River starting at the proposed PolyMet site"; that, "[o]n two occasions, [he has] canoed, hunted grouse and duck, and explored the woods on the proposed PolyMet mine site and the proposed PolyMet land exchange site"; and that "WaterLegacy helped with logistics and volunteers to support a canoe flotilla from the proposed PolyMet site to St. Paul that [his] family, and [their] neighbors, including indigenous people, led in 2012."

Poly Met Mining noted that Scoles did not indicate that he plans to return to the federal land proposed for exchange and that the public inaccessibility of the land "makes

it impossible for WaterLegacy's members to have the requisite 'firm intentions.'" WaterLegacy filed a supplemental affidavit of Scoles, which is dated March 24, 2017. In it, Scoles stated that, "[i]f the proposed PolyMet land exchange site remains in the Superior National Forest and is not fenced off, graded, clear-cut or otherwise degraded as a result of the proposed PolyMet land exchange, [he] intend[s] to return to this site this coming summer and in the future to hunt, portage, canoe and otherwise enjoy the site for recreation, back wood aesthetics, and to seek food for [his] family."

Poly Met Mining responded that "[i]t is neither legal nor feasible for [Scoles] to visit the land being transferred to PolyMet." Poly Met Mining stated that the railroad tracks mentioned in Scoles' initial affidavit "are not public land"; that walking on them constitutes trespass; that Poly Met Mining "is unaware of any way to access the [federal land proposed for exchange] that does not involve either trespass on private property, potentially insurmountable obstacles, or both"; that Poly Met Mining is not aware of "anyone using water routes to access the property"; and that "[a]ny effort to create such a water route, if it were possible at all, would involve serious physical challenges, including shallow and rocky water, beaver dams, a lack of public portage routes, fallen [trees] in the water, and brush covering the water and banks." In support, Poly Met Mining filed a declaration of Kevin Pylka, its manager of environmental permitting and compliance. Pylka attached copies of title documents to demonstrate the interest of Cliffs Erie, L.L.C., and related entities in the railroad right of way, a map that displayed surface ownership interests around the federal land proposed for exchange, and photographs of various bodies of water near the federal land.

In a declaration that WaterLegacy filed on April 25, 2017, Scoles stated, "After scouting briefly along the rail bed on foot, my two trips to enjoy the proposed PolyMet land exchange site and the Superior National Forest area just south of the site were made by canoe, paddling up the Partridge River from land also within the Superior National Forest." He acknowledged that "there are some places on the Partridge River where [he] had to portage." He asserted that the pictures attached to Pylka's declaration did not portray features that would render the areas inaccessible.

After the stay was lifted, WaterLegacy filed a supplemental declaration of Scoles, which is dated February 11, 2019. In it, he summarized two trips to the federal land he made as of April 2017:

> As of April 2017, I had taken two trips to the PolyMet land exchange site in the Superior National Forest. For each of these trips, after scouting briefly along the rail bed on foot, I enjoyed the PolyMet land exchange site and canoed on the Partridge River south of the site. I explored the woods, hunted grouse and duck, and saw a moose and her calf just south of the site near where the power line crosses the Partridge River.

Scoles stated that he "scouted the South Branch of the Partridge River, the Partridge River, and the PolyMet land exchange site by canoe and on foot" in late summer 2017. In addition, he "guided a group to the PolyMet land exchange site" over the Labor Day weekend in 2017:

> We canoed from Superior National Forest land on the South Branch of the Partridge River to the PolyMet land exchange site in one day and then returned to camp overnight at the confluence of the South Branch River and the Partridge River. Our group included elders and people with a modest level of outdoors experience, and they were quite capable of

> portaging over the several beaver dams on our route and
> navigating canoes through the large culvert beneath the
> railroad tracks just south of the PolyMet land exchange site to
> reach the site itself.

The Court finds Scoles's statements insufficient to establish WaterLegacy's standing. His first affidavit, signed a few days before WaterLegacy commenced this action, described past visits to the federal land without expressing any intent to return. In his second affidavit, dated March 24, 2017, Scoles asserted his intent to return to the federal land "this coming summer and in the future." He did not assert he had a concrete plan to return to the site when WaterLegacy commenced this action, and he did not describe how he intended to overcome legal and practical difficulties in accessing the site. *See* Minn. Stat. § 609.85. In his April 2017 declaration, Scoles questioned the access issues described by Pylka without asserting he had a concrete plan to return to the site when WaterLegacy sued. In his February 2019 declaration, he described visits to the site made before WaterLegacy commenced this action and visits to the site made in summer 2017. Because Scoles did not set forth a specific and concrete plan to return to the federal land when WaterLegacy commenced this action, the Court finds his statements insufficient to establish WaterLegacy's standing.

### b.      Tammen

In an affidavit dated January 17, 2017, Tammen stated that he owns "property within the Superior National Forest … less than twenty miles from the … federal lands proposed to be exchanged by the U.S. Forest Service"; that he uses the property "at least every month when forest roads are passable"; and that he fishes, canoes, enjoys the quiet,

and watches wildlife at his property. He stated that he has "enjoyed viewing the Superior

National Forest lands proposed to be exchanged to build the PolyMet mine from the air";

that he "rented a float plane and a local pilot to view some of the landscapes near where

[he lives] in Northeastern Minnesota"; and that, "[f]rom the air, the federal lands

proposed for the PolyMet land exchange are aesthetically pleasing national forest lands,

with woods, swamps, a winding headwaters stream, and an occasional logging trail." In a

supplemental affidavit dated March 18, 2017, Tammen stated, "If the site proposed for

the PolyMet land exchange remains under Superior National Forest management, I intend

to enjoy its aesthetics from the air again in the near future." "Such 'some day'

intentions—without any description of concrete plans, or indeed even any specification of

*when* the some day will be—do not support a finding of the 'actual or imminent' injury

that our cases require." *Summers*, 555 U.S. at 496 (quoting *Defenders of Wildlife*, 504

U.S. at 564). In addition, nothing about the land exchange itself threatens imminent harm

to the views enjoyed by Tammen. The Court finds Tammen's statements insufficient to

establish WaterLegacy's standing.

**B.      Case No. 17-cv-905**

**1.      Amended complaint**

Minnesota Center for Environmental Advocacy, Center for Biological Diversity,

and the W.J. McCabe Chapter of the Izaak Walton League of America commenced this

action on March 27, 2017. The following paragraphs summarize their amended

complaint, which was filed on June 16, 2017.

Minnesota Center for Environmental Advocacy "is a Minnesota nonprofit public interest organization whose mission is to use law, science, and research to protect and enhance Minnesota's natural resources, wildlife and the health of its people." Am. Compl. ¶ 8. "A number of [its] members live and recreate on or near the lands to be conveyed by the Forest Service, as well as the lands being acquired in the exchange. [Its] members use and enjoy these lands for recreation, spiritual, cultural, economic and aesthetic enjoyment." *Id.* ¶ 11.

Center for Biological Diversity "is a national, nonprofit conservation organization with more than 52,000 members throughout the United States and the world. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction." *Id.* ¶ 12. It "has many members who reside within and/or regularly use, enjoy, and recreate on public lands and waters in northeastern Minnesota, including on the Superior National Forest." *Id.*

The W.J. McCabe Chapter of the Izaak Walton League of America "is a grassroots environmental organization that has worked for decades to protect the natural resources of Duluth and greater Minnesota. The McCabe Chapter takes a common-sense approach towards protecting our country's natural heritage and works to improve outdoor recreation opportunities for all." *Id.* ¶ 14. It has "hundreds of members who regularly use, enjoy and recreate on public lands in northeastern Minnesota, including the Superior National Forest," and it "dedicates significant resources to the protection of the St. Louis River at the headwaters of Lake Superior, downstream of the proposed NorthMet mine." *Id.*

The Forest Service is an agency within the United States Department of Agriculture. *Id.* ¶ 20. It is "charged with the responsibility of managing natural resources within the national forests throughout the United States." *Id.* Sonny Perdue "is named in his official capacity as Secretary of Agriculture. Secretary Perdue is the highest-ranking official within the U.S. Department of Agriculture, and in that capacity, has ultimate responsibility for the administration and implementation of the Federal Land Policy and Management Act with regard to land exchanges." *Id.* ¶ 21. Thomas Tidwell, the Chief of the Forest Service, is "the highest level official responsible for management actions carried out by the Forest Service, including the land exchange process at issue in this action."[3] *Id.* ¶ 22. Constance Cummins is the Supervisor of the Superior National Forest and the deciding officer on the Final Record of Decision, which approved the NorthMet Project Land Exchange. *Id.* ¶ 23.

Poly Met Mining "controls the mineral rights to the NorthMet ore body and has applied for federal and state permits to build an open-pit mine to recover the copper-nickel-platinum group metals of the NorthMet deposit. Under the terms of the Final Record of Decision, PolyMet is the grantee receiving legal title to the surface rights at issue in the land exchange." *Id.* ¶ 24.

"The sole purpose of the NorthMet land exchange is to resolve a conflict between the Forest Service and PolyMet concerning PolyMet's right to conduct open-pit mining on lands for which it controls the subsurface mineral rights. Surface rights to

---

[3]     Vicki Christiansen was automatically substituted as a party. *See* Fed. R. Civ. P. 25(d).

those lands were purchased by the Forest Service beginning in 1935, and are currently

National Forest System lands administered as part of the Superior National Forest." *Id.*

¶ 33. The Forest Service took "the position that the mineral rights that were reserved

when the lands were purchased do not include the right to surface mine as proposed by

PolyMet." *Id.* Poly Met Mining took "the position that the mineral rights it controls

provide for access to those minerals by any mining method, including the open pit mining

proposed in its Permit to Mine Application submitted to the Minnesota Department of

Natural Resources in November 2016." *Id.* The land exchange would eliminate this

conflict. *Id.* ¶ 34.

The Final Record of Decision "authorizes the conveyance of 6,650.2 acres of

federal land located in St. Louis County, Minnesota to PolyMet, in exchange for the

acquisition of 6,690.4 acres of non-federal lands in four tracts." *Id.* ¶ 35. "The value of

the federal land, according to the Final Record of Decision, is $3,658,000, and the value

of the non-federal lands is $4,083,000. Forest Service will equalize the transaction with a

cash payment of $425,000." *Id.* ¶ 36 (citation omitted).

"The Appraisal Report for the NorthMet land exchange is premised on an

'extraordinary assumption' that the party owning the mineral rights and seeking the

exchange – here, PolyMet – would not have the right to access the minerals via surface

mining. In other words, the 'extraordinary assumption' instructs the appraiser to value

the surface land without regard to its potential mineral development." *Id.* ¶ 43. "Having

concluded that mining 'does not appear feasible' on the lands to be exchanged, the

appraisal report does not provide any estimates of value for lands on which the highest

and best use is mining." *Id.* ¶ 53. "A more accurate valuation of the federal lands that did not ignore their potential use for mining would have produced a much higher valuation. Comparable sales demonstrate that properties sold to facilitate mining are sold for amounts much higher than the $550/acre used by the Forest Service in the present land exchange." *Id.* ¶ 60.

"[T]here is no factual basis for the appraisal's and the Forest Service's assumption that the surface rights at issue would be valued on an open, fair market solely for their value for timber. This assumption is unsupportable even if the purchaser does not also own or control the subsurface mineral rights. Although ownership of the surface rights alone does not carry the right to mine buried minerals, the market recognizes that properties ancillary or adjacent to valuable mineral deposits carry greatly enhanced value, above and beyond their value for timber or recreation alone." *Id.* ¶ 61.

Minnesota Center for Environmental Advocacy, Center for Biological Diversity, and the W.J. McCabe Chapter of the Izaak Walton League of America's Amended Complaint contains one claim for relief. It invokes the Administrative Procedures Act and the Federal Land Policy and Management Act. Minnesota Center for Environmental Advocacy, Center for Biological Diversity, and the W.J. McCabe Chapter of the Izaak Walton League of America asserted the Forest Service failed to comply with the equal value requirement of the Federal Land Policy and Management Act. They sought declaratory and injunctive relief.

## 2.    Standing

Poly Met Mining moved to dismiss Case No. 17-cv-905 on the ground that Minnesota Center for Environmental Advocacy, Center for Biological Diversity, and the W.J. McCabe Chapter of the Izaak Walton League of America lack standing under Article III of the U.S. Constitution.  Poly Met Mining asserted that any alleged injuries from the mine are not imminent and are not fairly traceable to the land exchange and that the land exchange does not injure the plaintiffs.

Minnesota Center for Environmental Advocacy, Center for Biological Diversity, and the W.J. McCabe Chapter of the Izaak Walton League of America responded that they "clearly alleged facts demonstrating specific injuries directly attributable to the faulty land valuation and redressable by action from this Court."  They identified six: (1) "[p]roperty value losses caused by the low valuation of the federal lands to be exchanged"; (2) "[p]roperty value losses caused by the conversion of nearby protected federal lands into private lands open for industrial development (likely mining, given the mineral values present)"; (3) "[r]ecreational and aesthetic injuries suffered by members who have used and enjoyed the federal lands to be exchanged and would be foreclosed from future use and enjoyment when those public lands become private"; (4) "[r]ecreational and aesthetic injuries suffered by members who use and enjoy federal public lands for hiking, camping, fishing, hunting, birdwatching, photography and canoeing, and who would be injured by the diminution in the acreage of the Superior National Forest as compared to an exchange based on a non-fictitious valuation of the federal lands"; (5) "[r]ecreational and aesthetic injuries suffered by individual members

who care for and recreate in the St. Louis River, the headwaters of which will be opened up for industrial development as a result of the unlawfully valued land exchange"; and (6) "[e]conomic injuries suffered by Plaintiff organizations that will be required to expend time and resources to ensure that the federal government will not allow unlawful development of public lands and will not exchange public lands for less than their fair value."  In addition, Minnesota Center for Environmental Advocacy, Center for Biological Diversity, and the W.J. McCabe Chapter of the Izaak Walton League of America asserted that they have standing based on injuries attributable to the proposed mine project.

### a.    Property value losses

To establish the alleged property value losses, a declaration of one of Minnesota Center for Environmental Advocacy's members, Susan Holman, was submitted.  In it, she recounted her unsuccessful efforts to sell 120 acres of undeveloped land that she and her husband bought in 2004 for $600/acre.  She listed the property for sale in 2007 for $1,000/acre and subsequently reduced the price to $650/acre.  Holman received "one inquiry asking if [she] would sell the property for $500/acre," which is below the price she paid and the assessed value.  The land is between Babbitt and Hoyt Lakes, Minnesota, near the confluence of Longnose Creek and the Partridge River.  According to Holman, "[n]o one is interested in buying land so close to PolyMet's proposed mine, and so close to the rivers that are directly downstream of the proposed mine site."  With respect to the appraisal of the federal land, she stated:

> I am aware that the lands that PolyMet wants to mine
> were valued by the Forest Service at $550/acre. I believe that
> this price estimate is much too low, and will only further hurt
> my ability to sell my land at a reasonable price. My property
> would be best used for either timber or recreation, and having
> a valuation this low so close to my property will force me to
> further reduce my listing price to a level that is far below its
> assessed value, and its fair market value.

"Article III standing is assessed based on multi-part test, which, for associations, includes the issue of whether the interests at stake are germane to the organization's purpose." *Cent. S.D. Coop. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 895 (8th Cir. 2001). Holman is a member of Minnesota Center for Environmental Advocacy, which "is a Minnesota nonprofit public interest organization whose mission is to use law, science, and research to protect and enhance Minnesota's natural resources, wildlife and the health of its people." Am. Compl. ¶ 8. The alleged property value losses are not germane to the purpose of Minnesota Center for Environmental Advocacy or those of Center for Biological Diversity and the W.J. McCabe Chapter of the Izaak Walton League of America. The plaintiffs failed to establish their standing based on property value losses.

### b. Recreational and aesthetic interests

To establish "[r]ecreational and aesthetic injuries suffered by members who have used and enjoyed the federal lands to be exchanged and would be foreclosed from future use and enjoyment when those public lands become private," the plaintiffs cited a declaration dated June 20, 2017, of Lori Andresen. She is a member of Minnesota Center for Environmental Advocacy and Center for Biological Diversity. Andresen lives in

Duluth, Minnesota; owns property in northern Minnesota; and fishes, hikes, and canoes a few times per month during the spring and summer in the Superior National Forest. She "visited the proposed site of the of NorthMet project in 2005, touring the processing plant and hiking and berry picking at the potential mine site."[4] In spring 2017, Andresen hiked via public lands from a forest road to the federal land that the Forest Service seeks to exchange with Poly Met Mining. She intends to return to the federal land proposed for the land exchange in August 2017. She has "flown over the proposed land exchange numerous times, taking pictures of the plant and proposed land exchange area." Andresen has enjoyed visits to Skibo Vista, where she saw "the site of the land exchange and proposed mine" and intends to return to Skibo Vista later in 2017. "If the federal lands that are to be exchanged with PolyMet are logged, degraded, developed, or a mine is built on the site, [her] use and enjoyment of this viewpoint will be impaired."

Insofar as the plaintiffs relied on Andresen's visits to the site to establish standing based on "[r]ecreational and aesthetic injuries suffered by members who have used and enjoyed the federal lands to be exchanged and would be foreclosed from future use and enjoyment when those public lands become private," the Court finds her statements insufficient. Andresen visited the site in 2005 as part of a trip sponsored by Poly Met Mining. She did not return to it for more than a decade, and then only after this action's commencement. Andresen did not detail a specific and concrete plan to visit the site when this action was commenced. The plaintiffs failed to establish their standing based

---

[4]     In a declaration that was filed in Case No. 17-cv-909, Andresen described her visit to the site in 2005 as one sponsored by Poly Met Mining.

on Andresen's visits to the site.  *See Ecological Rights Found.*, 230 F.3d at 1149

("Repeated recreational use itself, accompanied by a credible allegation of desired future

use, can be sufficient, even if relatively infrequent, to demonstrate that environmental

degradation of the area is injurious to that person."); *Ohio Valley Envtl. Coal., Inc. v.*

*Maple Coal Co.*, 808 F. Supp. 2d 868, 879-80 (S.D. W. Va. 2011) ("The timing of the

trips, the manner in which they were planned, and the lack of a prior connection to

Armstrong Creek leads this Court to conclude that the sole purpose of the water

monitoring trips was to manufacture standing.  This connection is insufficient 'to make

credible the contention that the person's future life will be less enjoyable' as a result of

Defendant's alleged exceedance of the selenium effluent limitations.").

Unless and until Poly Met Mining secures the permits needed to build its mine,

nothing in the record indicates it intends any changes to the federal land after the land

exchange that would affect those not on the property.  *See Summers*, 555 U.S. at 494-96.

The Court therefore concludes that the plaintiffs have not established standing based on

"[r]ecreational and aesthetic injuries suffered by individual members who care for and

recreate in the St. Louis River, the headwaters of which will be opened up for industrial

development as a result of the unlawfully valued land exchange."

Finally, insofar as the plaintiffs claimed standing based on "[r]ecreational and

aesthetic injuries suffered by members who use and enjoy federal public lands for hiking,

camping, fishing, hunting, birdwatching, photography and canoeing, and who would be

injured by the diminution in the acreage of the Superior National Forest as compared to

an exchange based on a non-fictitious valuation of the federal lands," the plaintiffs failed

to demonstrate an injury that is concrete, particularized, and actual or imminent; and that is redressable by a favorable ruling.  Were the Final Record of Decision set aside, the Forest Service and Poly Met Mining might or might not agree to another land exchange. The results of a new appraisal and the value of land offered by Poly Met Mining might or might not increase the acreage in the Superior National Forest.

### c.      Expenditure of time and resources by the plaintiffs

The plaintiffs asserted that they have standing based on "[e]conomic injuries suffered by Plaintiff organizations that will be required to expend time and resources to ensure that the federal government will not allow unlawful development of public lands and will not exchange public lands for less than their fair value."  In support, they cited the declaration of Kathryn Hoffman, the executive director of Minnesota Center for Environmental Advocacy.  She stated: "[t]he mission of MCEA is to use law, science, and research to protect Minnesota's natural resources, wildlife, and the health of its people"; "[a] central aspect of MCEA's mission is to preserve the public lands of Northern Minnesota and prevent harmful water pollution throughout Minnesota"; "MCEA litigates, where appropriate, to enforce laws that protect clean water and public health"; "MCEA's advocacy has led to numerous legislative, administrative, and judicial decisions to keep Minnesota's waters clean and public lands protected from unwise development"; and "MCEA is challenging this land exchange because if MCEA is successful then we will further our mission of protecting Minnesota's natural resources, wildlife, and the health of its people."  Hoffman described the costs incurred by

Minnesota Center for Environmental Advocacy with respect to the NorthMet Project

Land Exchange:

>7. The U.S. Forest Service's illegal conduct in approving this land exchange has caused MCEA to incur costs and expend resources in furtherance of MCEA's mission. MCEA staff has had to investigate the appraisal and documents associated with the transfer, in order to better understand the agency's action. In numerous comment periods on Draft, Supplemental, and Final Environmental Impact Statements MCEA staff had to consult experts and devote significant staff resources to issues related to the land exchange such as assessing value of lands to be traded. MCEA then submitted comments on the exchange and related issues. Over the course of the environmental review period MCEA has had to expend resources in educating members of its board and the public about the Forest Service's proposed action and its role in affecting Minnesota's environment and the lives of its citizens.

>….

>9. The resources that MCEA has expended in assessing the valuation of the federal lands to be exchanged are significant. They include staff time and scarce monetary resources spent on consultants, office expenses and filing fees. The devotion of these resources to this issue directly impacts the extent to which we are able to effectively advocate for cleaner air, water and soil for all Minnesotans.

"Standing may be found when there is a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests." *Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers,

there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). Hoffman's declaration does not establish that Minnesota Center for Environmental Advocacy's activities have been perceptibly impaired. *Cf. Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury. Furthermore, an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" (alteration in original) (citation omitted)); *Cross*, 184 F.3d at 980 ("While it has alleged that the policy does not permit RSB to convey information needed by its clients, NFB has not alleged that the policy has impacted *it* in any measurable way.").

### d.     Mine

The Final Record of Decision does not authorize Poly Met Mining to build a mine. It states:

> A final decision on the land exchange will not authorize PolyMet's mining proposal to occur. Other governmental entities have the responsibility and authority to make decisions related to permitting the mining project, primarily the State of Minnesota and the U.S. Army Corps of Engineers …. The Forest Service assumes no responsibility for enforcing laws, regulations or policies under the jurisdiction of other governmental agencies.

The Final Record of Decision recognizes "the myriad of final permitting and financial assurance specifications for mining activities on the land to be conveyed." Insofar as the plaintiffs asserted they have standing based on injuries attributable to the proposed mine project, they presented neither "an injury that is concrete, particularized, and actual or imminent" nor an injury that is "fairly traceable to the defendant's challenged behavior." *Dep't of Commerce*, 139 S. Ct. at 2565; *see Defenders of Wildlife*, 504 U.S. at 560-62.

## C.    Case No. 17-cv-909

### 1.    Amended complaint

Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club commenced this action on March 27, 2017. The following paragraphs summarize their amended complaint, which was filed on June 12, 2017.

Save Our Sky Blue Waters "is a Minnesota nonprofit public interest organization" whose "mission is to protect the waters, forests, wildlife and ecology of Minnesota's Arrowhead Region." Am. Compl. ¶ 12. Its members "visit and enjoy the Superior National Forest for educational, recreational, and scientific activities, including hiking, canoeing, camping, fishing, harvesting, photography, and observing wildlife." *Id.* They "have visited the federal lands the Forest Service seeks to exchange with PolyMet, where PolyMet seeks to construct its proposed NorthMet copper mine, including a PolyMet-sponsored site visit, and other more recent visits." *Id.* ¶ 14.

Save Lake Superior Association "is a Minnesota nonprofit organization" whose mission "is to prevent further degradation of Lake Superior and to promote its rehabilitation." *Id.* ¶ 18. It "was formed in 1969 to stop the discharge of taconite tailings

into Lake Superior by Reserve Mining Company.  The waste material from the proposed

NorthMet mine would contain many of the same toxins, such as mercury, toxic metals

and asbestos-like fibers.  As stakeholders [Save Lake Superior Association] is concerned

about the potential destruction of natural habitat and the pollution of both air and water in

Lake Superior and its watershed that would be associated with this project and

prerequisite land exchange, and that Lake Superior's watershed would be treated as a

'brownfield.'"  *Id.*  Its members "visit and enjoy the Superior National Forest for

educational, recreational, and scientific activities, including hiking, canoeing, camping,

fishing, harvesting, photography, and observing wildlife."  *Id.*

"Sierra Club was founded in 1892 and is the nation's oldest grassroots

environmental organization."  *Id.* ¶ 19.  It "is dedicated to the protection and preservation

of the natural and human environment, including the Superior National Forest."  *Id.*

"Sierra Club members use and enjoy the Superior National Forest for recreational,

aesthetic, scientific, and commercial purposes."  *Id.*

"Defendant United States is a governmental entity, of which two agencies – the

U.S. Forest Service and the U.S. Army Corps of Engineers – jointly propose the

Northmet Mining Project and jointly issued the Final Environmental Impact Statement

for the Project."  *Id.* ¶ 21.  The "Forest Service is a federal agency within the U.S.

Department of Agriculture" and is "responsible for the management policies and actions

undertaken with respect to the public lands." *Id.* ¶ 22.  Thomas Tidwell is the Chief of the Forest Service.[5]

"PolyMet Mining Corporation is a publicly traded company exclusively focused on developing the NorthMet copper-nickel-precious metals project, through its wholly owned subsidiary, … PolyMet Mining, Inc." *Id.* ¶ 24.

In November 2015, the Forest Service and the Army Corps of Engineers "jointly issued a Final Environmental Impact Statement for the NorthMet Mining Project and Land Exchange." *Id.* ¶ 25.  "The NorthMet Project would create an open pit copper, nickel, and platinum group element mine with adjacent temporary stockpiles and a permanent stockpile; refurbish a portion of the former LTV Steel Mining Company (LTVSMC) processing plant and construct a new hydrometallurgical facility at the plant site; construct an upgraded tailings basin facility on the existing LTVSMC tailings facilities; construct waste water treatment facilities at both the mine site and plant site; and add to existing utility infrastructure and rail lines." *Id.* ¶ 26.  "The Land Exchange portion of the project would consist of USFS conveyance of Superior National Forest Lands encompassing the NorthMet mine site and surrounding lands to PolyMet, and USFS acquisition from PolyMet of up to five tracts of private lands within the Superior National Forest proclamation boundary." *Id.* ¶ 27.

"When it issued the Draft Environmental Impact Statement (DEIS) for the Northmet Project, the federal government did not include any analysis of the impacts of

---

[5]      Vicki Christiansen was automatically substituted as a party.  *See* Fed. R. Civ. P. 25(d).

the land exchange portion of the project." *Id.* ¶ 28. In February 2010, the U.S. Environmental Protection Agency "commented on the DEIS, noting that the federal government had stated that 'mining activities cannot take place without the transfer of land from the USFS to PolyMet'; that '[t]he National Forest land in question would not be transferred out of USFS ownership if not for the nature of the proposed mining project'; and that therefore, under NEPA, the proposed land exchange was therefore a 'connected action' that must be analyzed together with the project as a whole in a single Environmental Impact Statement." *Id.* ¶ 29. "[T]he final [Environmental Impact Statement] did include the land exchange as part of the project, with the [Forest Service] and [Army Corps of Engineers] jointly analyzing the impacts of the project." *Id.* ¶ 31.

In January 2017, the Forest Service "issued a Final Record of Decision … on the NorthMet Project Land Exchange portion of the project." *Id.* ¶ 32. "[T]here is not yet a decision on [the Army Corps of Engineers] portion of the Project (the permit for the mining), nor is there yet a final determination as to the adequacy of the EIS for the Project …." *Id.* ¶ 33. "It appears from the information available to the public that the deeds will be exchanged for the land exchange portion of the project prior to the permitting decision being made." *Id.* ¶ 34.

Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club asserted three counts under the Administrative Procedures Act. In Count 1, they alleged that "[t]he decision to complete the Land Exchange portion of the project prior to the final [Army Corps of Engineers] permitting decision on the Mining Project will have an adverse environmental impact and/or will limit the choice of reasonable alternatives for

the Mining Project, and therefore violates [the National Environmental Policy Act]." *Id.*

¶ 47. In Count 2, Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club alleged that the United States, the Forest Service, and Tidwell violated the Weeks Act by accepting private lands in trade "in which there are reserved or outstanding interests that would interfere with the use and management of the land by the United States or would otherwise be inconsistent with the authority under which, or the purpose for which, the lands are to be acquired" and by not ensuring the land exchange is in the public interest. In Count 3, they claimed the United States, the Forest Service, and Tidwell violated the National Environmental Policy Act by failing to analyze a reasonable range of alternatives. Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club sought declaratory and injunctive relief.

### 2. Standing

Poly Met Mining moved to dismiss Case No. 17-cv-909 on the ground that Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club lack standing under Article III of the U.S. Constitution. Poly Met Mining asserted that they are not injured by the land exchange itself and that they cannot demonstrate an imminent injury based on the potential effects of the proposed mine.

Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club responded that they have standing. They asserted:

> Once privatized, the lands will lose the federal protections
> benefitting [their] interests. In particular (as emphasized by
> Polymet's arguments), Polymet will likely immediately ban
> access to these lands by the public (including plaintiffs'
> members), and at any time could and (as promised, would)

> then undertake mining and related activities that would harm
> plaintiffs' interests.

To establish their standing, Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club relied on declarations of their members, Andresen, Mark Fride, and Elaine Palcich.

As noted above, the Final Record of Decision does not authorize Poly Met Mining to build a mine. It states:

> A final decision on the land exchange will not
> authorize PolyMet's mining proposal to occur. Other
> governmental entities have the responsibility and authority to
> make decisions related to permitting the mining project,
> primarily the State of Minnesota and the U.S. Army Corps of
> Engineers …. The Forest Service assumes no responsibility
> for enforcing laws, regulations or policies under the
> jurisdiction of other governmental agencies.

The Final Record of Decision recognizes "the myriad of final permitting and financial assurance specifications for mining activities on the land to be conveyed." Insofar as Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club asserted that they have standing based on the mine that Poly Met Mining seeks to build, they presented neither "an injury that is concrete, particularized, and actual or imminent" nor an injury that is "fairly traceable to the defendant's challenged behavior." *Dep't of Commerce*, 139 S. Ct. at 2565; *see Defenders of Wildlife*, 504 U.S. at 560-62. Unless and until Poly Met Mining secures the permits needed to build its mine, nothing in the record indicates it intends any changes to the federal land after the land exchange that would affect those not on the property. *See Summers*, 555 U.S. at 494-96.

Insofar as Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club asserted standing based on harm to their members' recreational and aesthetic interests, the declarations of Andresen, Fride, and Palcich do not establish an injury in fact for reasons stated above. Nothing about the land exchange itself threatens imminent harm to the views enjoyed from Skibo Vista or from the air. Visits to the federal land proposed for the exchange in 2005 as part of a trip sponsored by Poly Met Mining coupled with a return to the site in 2017 after this action's commencement do not demonstrate use of the federal land by persons for whom the aesthetic and recreational values of the area will be lessened by the land exchange. *See Ecological Rights Found.*, 230 F.3d at 1149; *Ohio Valley Envtl. Coal.*, 808 F. Supp. at 879-80. The alleged loss of federal protections over the federal land proposed for the exchange does not establish the standing of Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club. *See Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").

### D. Case No. 17-cv-914

#### 1. Complaint

Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters commenced this action on March 28, 2017. The following paragraphs summarize their complaint.

Center for Biological Diversity "is a non-profit corporation headquartered in Tucson, Arizona." Compl. ¶ 6. It "works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction." *Id.*

Earthworks "is a non-profit corporation headquartered in Washington DC." *Id.* ¶ 7. It "is dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions." *Id.*

Save Our Sky Blue Waters "is a non-profit public interest corporation based in Duluth, Minnesota." *Id.* ¶ 8. It "seeks to protect the ecological integrity of Minnesota's Arrowhead Region." *Id.*

Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters brought "this action on their own behalf, and on behalf of their members who derive scientific, aesthetic, recreational, and spiritual benefits from northern long-eared bats, gray wolves, Canada lynx, and these species' habitats on the Superior National Forest." *Id.* ¶ 9. Their "members use and enjoy the Superior National Forest for a variety of purposes, including hiking, fishing, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities," and their members' "enjoyment of the Superior National Forest is enhanced by the knowledge that imperiled species including the northern long-eared bat, gray wolf, and Canada lynx are still found on the national forest." *Id.* ¶ 10. "The areas of the Superior National Forest that Plaintiffs' members intend to continue to use and enjoy include areas within, nearby, and downstream of the proposed NorthMet Mine, and areas where the northern long-eared bat, gray wolf, and Canada lynx may be found." *Id.* ¶ 11.

Ryan Zinke "is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of the [Endangered Species Act] with regard to terrestrial endangered and threatened species, including the northern long-eared bat, gray wolf and Canada lynx."[6]  *Id.* ¶ 13.  The U.S. Fish and Wildlife Service "is an agency within the U.S. Department of the Interior."  *Id.* ¶ 14.  "It and its officers are responsible for administering the [Endangered Species Act] …."  *Id.*  Thomas Tidwell is the Chief of the U.S. Forest Service.[7]  *Id.* ¶ 15.  The U.S. Forest Service "is an agency within the U.S. Department of Agriculture."  *Id.* ¶ 16.  "It and its officers are responsible for the lawful management of the National Forest System, including the Superior National Forest."  *Id.*

"The Canada lynx is a medium-sized cat with long legs and unusually large paws which make it highly adapted for hunting in deep snow."  *Id.* ¶ 32.  The Fish and Wildlife Service designated the Canada lynx as a threatened species under the Endangered Species Act in 2000.  *Id.*  "A number of land management activities on the Superior National Forest may affect Canada lynx and lynx habitat, including mining exploration and other mining activities.  Land exchanges concerning proposed mining sites on the Superior National Forest may also result in a loss of lynx habitat, lynx prey habitat, and connectivity."  *Id.* ¶ 34.  "In 2005, [the Fish and Wildlife Service] completed a 'Recovery

---

[6]      David Bernhardt was automatically substituted as a party.  *See* Fed. R. Civ. P. 25(d).

[7]      Vicki Christiansen was automatically substituted as a party.  *See* Fed. R. Civ. P. 25(d).

Outline' for Canada lynx. The Canada lynx Recovery Outline serves as an interim strategy to guide recovery efforts and inform the critical habitat designation process for lynx until a draft recovery plan has been completed." *Id.* ¶ 39. In February 2009, the Fish and Wildlife Service "issued a final rule revising the critical habitat designation for Canada lynx. By definition, the critical habitat designation includes the specific areas within the geographic area which is occupied by lynx and on which are found the physical and biological features that are essential to the conservation of the species." *Id.* ¶ 41 (citation omitted). "The majority of the Superior National Forest is within designated lynx critical habitat." *Id.* ¶ 42.

"Gray wolves are the largest wild members of the dog family, with adults weighing up to 175 pounds. Gray wolves play a critical ecological role as a top predator and keystone species." *Id.* ¶ 45. The Fish and Wildlife Service designated the gray wolf as an endangered species under the Endangered Species Act in 1974. *Id.* "The Minnesota population of gray wolves was reclassified as a threatened species in 1978." *Id.* "All of the Superior National Forest is designated as critical habitat for the gray wolf." *Id.* ¶ 46. "A number of land management activities on the Superior National Forest may affect wolves and wolf habitat, including minerals exploration and mining projects. Land exchanges concerning proposed mining sites on the Superior National Forest may also result in a loss of wolf habitat, wolf prey habitat, and connectivity." *Id.* ¶ 48.

In 2015, the Fish and Wildlife Service listed the northern long-eared bat as a threatened species under the Endangered Species Act. *Id.* ¶ 53. "The main threat to the

northern long-eared bat is an invasive and often deadly fungal bat disease commonly referred to as White-Nose Syndrome, which has rampantly spread in bat populations from the Northeast to the Midwest and Southeast of the United States." *Id.* ¶ 56. "In Minnesota, northern long-eared bat populations are known from 15 hibernacula. An estimated 3,000 northern long-eared bats are thought to hibernate in the largest known hibernaculum in Minnesota, the Soudan Mine in St. Louis County." *Id.* ¶ 57. "White-Nose Syndrome was recently detected in bats within Minnesota for the first time, and has been confirmed in six Minnesota counties." *Id.* ¶ 58. In November 2015, the Fish and Wildlife Service "completed a biological opinion for activities affecting the northern long-eared bat within the Eastern Region of the National Forest System, which includes the Superior National Forest." *Id.* ¶ 59. It "concluded that these activities are not likely to jeopardize the continued existence of the northern long-eared bat." *Id.* In January 2016, the Fish and Wildlife Service "published a final '4(d) Rule' for the northern long-eared bat, pursuant to Section 4(d) of the [Endangered Species Act]." *Id.* ¶ 60. "The 4(d) rule only prohibits the 'incidental take' of northern long-eared bats within areas impacted by White-Nose Syndrome if the take occurs within known hibernaculum; results from tree removal activities that are within 0.25 mile of a known hibernaculum; or the implicated activities cut or destroy a known, occupied maternity roost tree or others trees within a 150-foot radius from the known, occupied maternity roost tree during the pup season from June 1 through July 31." *Id.* It "also prohibits the purposeful take of the northern long-eared bat, except in limited circumstances." *Id.*

In February 2016, the Fish and Wildlife Service "completed the Biological Opinion for the NorthMet Mine …. As explained in the Biological Opinion, PolyMet Mining Inc. … proposes the NorthMet Mine, an open-pit mine, on land in which the surface rights are owned by the United States, which would operate for 20 years." *Id.* ¶ 62. "The Forest Service has proposed a land exchange with PolyMet, and the development of the NorthMet Mine is dependent on the land exchange. The NorthMet Mine is an interrelated activity, and the effects of both the land exchange and the open-pit mine proposal on listed species and critical habitat are considered in the Biological Opinion." *Id.* ¶ 63.

"The NorthMet Mine would directly disturb at least 3,918 acres, including at least 1,719 acres at the Mine Site and 2,189 acres at the Plant Site." *Id.* ¶ 64. "The destruction of habitat at the Mine Site includes 1,333 acres of lynx denning, wolf cover, and northern long-eared bat roosting habitat. The loss of lynx, wolf, and bat habitat will be permanent, except where the reclamation of forested habitat can occur, which will take at least several decades." *Id.* ¶ 65.

"The Mine Site is within Lynx Analysis Unit ("LAU") #12 on the Superior National Forest. Neither the Forest Service nor [the Fish and Wildlife Service] have surveyed LAU #12 on the ground to determine how much of the LAU currently comprises suitable lynx habitat. The NorthMet Mine will result in the loss of at least 1,719 acres of lynx habitat in LAU #12." *Id.* ¶ 66.

The Fish and Wildlife Service concluded "in the Biological Opinion that mining activities at the Mine Site are likely to adversely affect lynx, wolf, critical habitats for

lynx and wolf, and the northern long-eared bat.  These impacts include the loss of habitat, reduced habitat effectiveness, habitat fragmentation, increased human presence, noise, and transportation impacts."  *Id.* ¶ 67.  "Wildlife movement in the region of the proposed NorthMet Mine is already significantly restricted as result of extensive landscape changes, including past and current iron ore and taconite mining.  The NorthMet Mine would further adversely affect remaining wildlife travel corridors near the Mine Site." *Id.* ¶ 71.  "The NorthMet Mine would result in the long-term, and in most areas, permanent loss of lynx habitat at the Mine Site and contribute to habitat fragmentation. Of the 1,719 acres of lynx critical habitat that would be destroyed at the Mine Site, only 202 acres have the potential to be eventually reclaimed with woody vegetation growth, although this may take many decades to be suitable as lynx habitat."  *Id.* ¶ 73.

"The Biological Opinion does not address or consider the impacts of the North Mine on the recovery of Canada lynx.  The Biological Opinion does not address or consider the 2005 Canada Lynx Recovery Outline."  *Id.* ¶ 75.  The Fish and Wildlife Service "determined in the Biological Opinion that the NorthMet Mine will result in significant adverse effects to the northern long-eared bat, gray wolf, and Canada lynx, including take.  Despite this determination, [the Fish and Wildlife Service ] concluded that the NorthMet Mine is not likely to jeopardize the continued existence of the northern long-eared bat, gray wolf, or Canada lynx, and is also not likely to destroy or adversely modify critical habitat for the gray wolf or Canada lynx."  *Id.* ¶ 76.

"The Biological Opinion includes an 'Incidental Take Statement.'  [The Fish and Wildlife Service] anticipated 'incidental take' in terms of one lynx and one wolf killed by

a vehicle or train every 20 years in the action area." *Id.* ¶ 77.  The Fish and Wildlife Service "described additional incidental take through a surrogate of acres of habitat for the lynx, wolf, and northern long-eared bat primarily due to vegetation and overburden removal at the Mine and Plant Sites, and along the Transportation and Utility Corridors." *Id.* ¶ 78.  The Fish and Wildlife Service "found in the Biological Opinion that direct incidental take of the northern long-eared bat may occur, but is not prohibited provided specific actions are implemented under the January 2016 final 4(d) rule for the bat." *Id.* ¶ 79.  It concluded "that the anticipated incidental take will not jeopardize the continued existence of Canada lynx, gray wolf, or northern long-eared bat," and "that 'while there may be adverse effects to critical habitat for both lynx and wolf, it will not be adversely modified.'" *Id.* ¶ 80.

The Fish and Wildlife Service "included two 'reasonable and prudent measures' within the Incidental Take Statement, which it stated are necessary and appropriate to minimize take of Canada lynx, gray wolf, and northern long-eared bat." *Id.* ¶ 81.  The first "concerned the incidental take of lynx and wolves caused by vehicle collisions," and the second "concerned the incidental take of northern long-eared bats." *Id.* ¶¶ 82-83.

The Fish and Wildlife Service "included two 'terms and conditions' within the Incidental Take Statement." *Id.* ¶ 84.  The first "concerned the incidental take of the northern long-eared bat, and provided that PolyMet will not conduct any activities that disturb or disrupt hibernating bats if any hibernacula are found in the Project area." *Id.* The second "sets forth 'reporting requirements.'" *Id.* ¶ 85.

Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters asserted two claims for relief. In the first, they alleged that the Fish and Wildlife Service's 2016 Biological Opinion "is unlawful under the [Endangered Species Act], and arbitrary and capricious under the [Administrative Procedures Act]." In their second claim, Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters alleged that the Forest Service violated the Endangered Species Act by relying on the Fish and Wildlife Service's 2016 Biological Opinion. They asked the Court to declare that "the 2016 Biological Opinion is unlawful under the [Endangered Species Act] and arbitrary and capricious under the [Administrative Procedures Act]"; to declare that "the Forest Service's reliance on the unlawful 2016 Biological Opinion violates the [Endangered Species Act]"; and to "[e]njoin any implementation of the proposed NorthMet Mine pending completion of a legally adequate Biological Opinion."

### 2.      Standing

Poly Met Mining asserted that the Court should dismiss Case No. 17-cv-914 because Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters lack standing under Article III of the U.S. Constitution. Poly Met Mining argued that "[t]ransferring title to PolyMet does not imminently threaten the plaintiffs with a concrete, particularized injury" and that "[a]ny potential injuries from the NorthMet mine cannot create standing to challenge the land exchange." Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters asserted that their "[m]embers … have the desire to observe lynx, wolves, and northern long-eared bats when they are using and enjoying the Superior National Forest, including specific areas that are on and nearby the

site of the land exchange and proposed mine project"; that their members "have demonstrated a concrete and particularized interest in the challenged land exchange and mine project"; that they need not meet normal standards for immediacy because their challenge to the 2016 Biological Opinion is a procedural claim; that they nevertheless satisfied the standard for substantive claims; and that their injuries are fairly traceable to the challenged agency actions and redressable by a favorable decision.

In the 2016 Biological Opinion, the Fish and Wildlife Service described separate proposed actions of the Forest Service and Army Corps of Engineers:

> The U.S. Army Corp of Engineers (USACE) and USDA Forest Service (hereafter USFS) have separate proposed actions on which consultation is occurring. The USACE has an application under the Clean Water Act from PolyMet to impact wetlands and other waters of the U.S. associated with the construction and operation of the NorthMet mine. The USFS is considering transferring approximately 6,495 acres of federal lands within the Superior National Forest to PolyMet in exchange for 7,075 acres of non-federal lands offered by PolyMet. The purpose of the land exchange is to eliminate a conflict between PolyMet's desire to surface mine and the United States' surface rights, including USFS administration of National Forest System land. Because the NorthMet Project is dependent on the land exchange, it is considered an interrelated activity, and as such, its effects to listed species and critical habitat must be considered in this biological opinion.

> Upon completion of the land exchange, the applicant (PolyMet) intends to develop their private lands. Development of the private lands is not a USFS decision, and the USFS will not retain discretion or authority over subsequent development of the private lands once the exchange is completed. The proposed future development is an indirect effect of the proposed land exchange, however, and would not occur but for the land exchange, as is

described later in this document. That is, the subsequent mining of the post-exchange private lands is reasonably certain to occur because the land exchange was proposed to facilitate PolyMet's desire to mine the lands. Off-site Wetland Mitigation Sites are also included in the proposed action.

The Fish and Wildlife Service concluded that "the land exchange, in and of itself, will not result in negative effects to lynx, wolf, and [northern long-eared bat]. However, the land exchange will lead to the subsequent development of the newly private lands, which will be an indirect effect of and caused by the proposed land exchange, thereby resulting in significant adverse effects and potential take of lynx, wolf, and [northern long-eared bat]."[8]

The Final Record of Decision does not authorize Poly Met Mining to build a mine. It states:

A final decision on the land exchange will not authorize PolyMet's mining proposal to occur. Other governmental entities have the responsibility and authority to make decisions related to permitting the mining project,

---

[8]     The Fish and Wildlife Service described direct and indirect effects:

Effects of the action are defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with the action, that will be added to the environmental baseline" (50 CFR §402.02). Direct effects are defined as the direct or immediate effects of the action on the species or its habitat. Direct effects result from the agency action, including the effects of interrelated and interdependent actions. Indirect effects are caused by or result from the agency action, are later in time, and are reasonably certain to occur. Indirect effects may occur outside of the immediate footprint of the project area, but would occur within the action area as defined.

> primarily the State of Minnesota and the U.S. Army Corps of
> Engineers …. The Forest Service assumes no responsibility
> for enforcing laws, regulations or policies under the
> jurisdiction of other governmental agencies.

The Forest Service's Final Record of Decision acknowledged "the myriad of final

permitting and financial assurance specifications for mining activities on the land to be

conveyed."

Center for Biological Diversity, Earthworks, and Save Our Sky Blue Waters failed

to establish they have standing. Their members' declarations do not demonstrate use of

the federal land by persons for whom the aesthetic and recreational values of the area will

be lessened by the land exchange. *See Ecological Rights Found.*, 230 F.3d at 1149; *Ohio

Valley Envtl. Coal.*, 808 F. Supp. at 879-80. The land exchange itself will not result in

negative effects to Canada lynx, gray wolves, or the northern long-eared bat. Unless and

until Poly Met Mining secures the permits needed to build a mine, nothing in the record

indicates it intends any changes to the federal land after the land exchange that would

result in negative effects to Canada lynx, gray wolves, or the northern long-eared bat.

Poly Met Mining's construction of a mine on the federal lands proposed for the exchange

was not imminent when Center for Biological Diversity, Earthworks, and Save Our Sky

Blue Waters brought this action, *City of Kennett v. EPA*, 887 F.3d 424, 430-31 (8th Cir.

2018); *Kimbell*, 623 F.3d at 556-57, and they have not satisfied the relaxed standard for

immediacy that applies to a procedural claim, *see Defenders of Wildlife*, 504 U.S. at 572

n.7. "[D]eprivation of a procedural right without some concrete interest that is affected

by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III

standing." *Summers*, 555 U.S. at 496; *see Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 987 (8th Cir. 2011).

## II.     Motions for preliminary injunction

The plaintiffs in Case No. 17-cv-276, Case No. 17-cv-905, and Case No. 17-cv-909 moved for preliminary injunctions.  Having concluded that the plaintiffs lack standing, the Court denies their motions.

## III.     Conclusion

Because the plaintiffs lack standing, the Court dismisses Case No. 17-cv-276, Case No. 17-cv-905, Case No. 17-cv-909, and Case No. 17-cv-914 without prejudice. *See Dalton v. NPC Int'l, Inc.*, 932 F.3d 693, 696 (8th Cir. 2019).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.     WaterLegacy's motion for preliminary injunction [Docket No. 93 in Case No. 17-cv-276] is DENIED.

2.     Poly Met Mining's motion to dismiss [Docket No. 99 in Case No. 17-cv-276] is GRANTED.

3.     Case No. 17-cv-276 is DISMISSED WITHOUT PREJUDICE.

4.     Poly Met Mining's motion to dismiss [Docket No. 77 in Case No. 17-cv-905] is GRANTED.

5.     Minnesota Center for Environmental Advocacy, Center for Biological Diversity, and the W.J. McCabe Chapter of the Izaak Walton League of America's motion for preliminary injunction [Docket No. 82 in Case No. 17-cv-905] is DENIED.

6.     Case No. 17-cv-905 is DISMISSED WITHOUT PREJUDICE.

7.     Poly Met Mining's motion to dismiss [Docket No. 70 in Case No. 17-cv-909] is GRANTED.

8. Save Our Sky Blue Waters, Save Lake Superior Association, and Sierra Club's motion for preliminary injunction [Docket No. 76 in Case No. 17-cv-909] is DENIED.

9. Case No. 17-cv-909 is DISMISSED WITHOUT PREJUDICE.

10. Poly Met Mining's motion to dismiss [Docket No. 70 in Case No. 17-cv-914] is GRANTED.

11. Case No. 17-cv-914 is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 30, 2019

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge